**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

_____

Nos. 96-3058/96-3143

_____

| | |
|---|---|
| ARE Sikeston Limited Partnership, a Pennsylvania limited partnership; American Real Estate Investment Corporation, as general and limited partner; American Hotel Management, Inc., | * * * * * * |
| | * |
| Appellants, | * |
| | * |
| v. | * |
| | * |
| Weslock National, Inc.; Nalcor, doing business as American Builders Hardware Corp., Inc., | * * * * |
| Appellees. | * |
| | * |
| Weslock National, | * |
| | * |
| Third Party Plaintiff - Appellee, | * |
| | * |
| v. | * |
| | * |
| Westinghouse Electric Corporation, | * * |
| Third Party Defendant - Appellee. | * |

Appeals and Cross-Appeal from the
United States District Court for the
Eastern District of Missouri.

_____

No. 96-3104

_____

ARE Sikeston Limited Partnership, a      *
Pennsylvania limited partnership;        *
American Real Estate Investment          *
Corporation, as general and limited      *
partner; American Hotel Management,      *
Inc.,                                    *
        Plaintiffs,                *
                                     *
    v.                         *
                                     *
Weslock National, Inc.; Nalcor, doing    *
business as American Builders            *
Hardware Corp., Inc.,                     *
                                     *
        Defendants,                *
                                     *
    v.                         *
                                     *
Weslock National, Inc.,                  *
                                     *
    Third Party Plaintiff - Appellant,  *
                                     *
    v.                         *
                                     *
Westinghouse Electric Corporation,       *
                                     *
    Third Party Defendant - Appellee.   *

_____

Submitted:  May 22, 1997
Filed:  July 22, 1997

_____

Before MURPHY, HEANEY, and MAGILL, Circuit Judges.
_____

MAGILL, Circuit Judge.

ARE Sikeston Limited Partnership and its general and limited partners (collectively, ARE Sikeston) brought this action against Weslock National, Inc. (Weslock National) and Nalcor, Inc. (Nalcor).  In its action, ARE Sikeston alleges that Weslock National and Nalcor are liable for the rent payments remaining on a 15-year lease that Nalcor entered into with ARE Sikeston.  Weslock National filed a third-party complaint against Westinghouse Electric Corporation (Westinghouse), seeking indemnification or contribution in the event that Weslock National is held liable to ARE Sikeston.  Weslock National and Westinghouse moved for summary judgment. ARE Sikeston moved for leave to file an amended complaint to add Westinghouse as a defendant.  The district court[1] granted Weslock National's and Westinghouse's motions for summary judgment and denied ARE Sikeston's motion for leave to amend its complaint.  ARE Sikeston Ltd. Partnership v. Weslock National, Inc., 932 F. Supp. 240, 243 (E.D. Mo. 1996).  In addition, the district court subsequently entered a judgment against Nalcor.  ARE Sikeston appeals, and Weslock National brings a protective cross appeal.  We affirm.

**I.**

_____

[1]The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri.

Nalcor, a manufacturer of residential door knobs and locksets, owned 30 acres of commercial real estate in Sikeston, Missouri (the Sikeston Property). The Sikeston Property included a 106,500-square-foot building that housed Nalcor's lock manufacturing operations. On December 27, 1988, ARE Sikeston purchased the

Sikeston Property from Nalcor, and as a part of the same transaction, ARE Sikeston leased backed the property to Nalcor pursuant to a written lease.

The term of the lease was for fifteen years at a rental rate of $299,250 per year, to be adjusted annually for inflation.  See Lease by and between ARE Sikeston Limited Partnership and Nalcor, Inc. (Dec. 27, 1988) (Lease) at §§ 1.02, 2.01, reprinted in I J.A. at 20-22. The lease also provided that "[a]ll assignments and subleases shall be subject to the prior written approval of Landlord [ARE Sikeston], which approval shall not be reasonably withheld or delayed."  Lease at § 9.01(a), reprinted in I J.A. at 33.

In December 1989, Nalcor acquired another lock manufacturing company and two plumbing parts manufacturers.  As a result of the acquisition, Nalcor acquired additional manufacturing facilities in Mexico and California.[2]  At its Sikeston Property facility, Nalcor continued its lock manufacturing operations.

In order to finance the December 1989 acquisitions, Nalcor obtained a $36 million credit facility from Westinghouse.  To secure this loan, Westinghouse took three major steps.  First, Westinghouse took a first lien and security interest in virtually all of Nalcor's assets, including those assets of Nalcor located at the Sikeston Property.  In the event of a default, the

_____

[2]Also as part of the same transaction, Nalcor changed its name to American Builders Hardware Corporation.  Notwithstanding this change of name, we will refer to this entity as Nalcor throughout this opinion.

financing and security agreement between Westinghouse[3] and Nalcor gave Westinghouse both the right to demand full payment and the right to take possession of Nalcor's assets, including those located at the Sikeston Property, if the demand for payment were not satisfied. <u>See</u> Financing & Security Agreement (Dec.

---

[3]This agreement was formed between Nalcor and Westinghouse Credit Corporation, the predecessor in interest to Westinghouse Electric Corporation. We will refer to both Westinghouse Credit Corporation and Westinghouse Electric Corporation as Westinghouse.

29, 1989) at § 14.1(C),(F), reprinted in I J.A. at 413-
14.  In addition, upon default, the financing and
security agreement granted Westinghouse the right to
collect Nalcor's accounts receivable and to sell its
assets.  Id. at § 14.1(G),(H), reprinted in I J.A. at
414-15.  As defined by the financing and security
agreement, an event of default included the insolvency of
Nalcor.  See id. at § 13(E), reprinted in I J.A. at 411.

Westinghouse also took a security interest in
Nalcor's lease and leasehold interest in the Sikeston
Property.  Westinghouse's security interest in Nalcor's
leasehold of the Sikeston Property was set forth in a
leasehold deed of trust executed by Nalcor and
Westinghouse.  Under the leasehold deed of trust,
Westinghouse had the right to enter the Sikeston Property
and to hold, use, and conduct business on the property in
the event of a default by Nalcor.  Specifically, the
leasehold deed of trust provided:

> Upon the occurrence of one or more Events of
> Default . . . [Westinghouse] personally, or by
> its employees, agents or attorneys, may enter
> into and upon all or any part of the [Sikeston
> Property], and exclude [Nalcor], its agents and
> servants wholly therefrom; and having and
> holding the same, use, operate, manage and
> control the [Sikeston Property] and conduct the
> business thereof . . . . [Westinghouse] shall
> have the right to manage and operate the
> [Sikeston Property] and to carry on the business
> thereof . . . .

Leasehold Deed of Trust (Feb. 13, 1990) at § 8, reprinted
in I J.A. at 124.  In addition, pursuant to § 8(c)(i) of

the leasehold deed of trust, Westinghouse had the right to foreclose on Nalcor's leasehold of the Sikeston Property in the event of a default.  See id. at § 8(c)(i), reprinted in I J.A. at 124.

Finally, Westinghouse also required that ARE Sikeston, as landlord, agree to waive certain of its rights with respect to Nalcor's assets and the Sikeston Property.  Accordingly, Westinghouse, ARE Sikeston, and Nalcor entered into a Landlord's

Consent and Waiver of Lien Rights.  Pursuant to this agreement, ARE Sikeston consented

> to the transfer, assignment, pledge, mortgage or encumbrance by [Nalcor] in favor of [Westinghouse] of [Nalcor]'s right, title and interest in and to [Nalcor]'s personal property and fixtures located at the [Sikeston Property] and to the grant by [Nalcor] of a Leasehold Mortgage of the [Sikeston Property] in favor of [Westinghouse].

Landlord's Consent & Waiver of Lien Rights (Dec. 29, 1989) at § 1, reprinted in Appellee's Add.  Moreover, as a part of the same agreement, ARE Sikeston gave up any rights it may have had to a first security interest in Nalcor's assets and retained only a subordinated security interest.  See id. at § 2, reprinted in Appellee's Add.

ARE Sikeston further agreed not to "modify, amend, terminate (except upon expiration of the Term of the Lease), accept a surrender or abandonment of, or otherwise agree to change the terms of the Lease, without the consent of [Westinghouse], which shall not be unreasonably withheld."  Id. at § 3, reprinted in Appellee's Add.  In the event of the termination of the original lease as a result of Nalcor's default, ARE Sikeston agreed "to enter into a new lease ('New Lease') of the Premises at the option of [Westinghouse] for the remainder of the term of the Lease . . . at the rent and additional rent, and upon the terms, covenants and conditions . . . of the [original] Lease . . . ."  Id. at § 5, reprinted in Appellee's Add.  Finally, the parties agreed that "[i]f any one or more provisions of the Lease

conflict with any provision [of the Landlord's Consent and Waiver of Lien Rights], such provisions of the Lease shall be wholly subordinate to and superseded by the applicable provision [of the Landlord's Consent and Waiver of Lien Rights]." Id. at § 7, reprinted in Appellee's Add.

In each of the years following the December 1989 acquisitions, Nalcor lost money and as a result gradually slipped into insolvency. By April 1993, Westinghouse estimated that it was undersecured in its loans to Nalcor by more than $10 million. Around this same time, Westinghouse began to explore the possibility of having another company acquire Nalcor. On April 20, 1993, Westinghouse declared Nalcor to be in default and made demand on Nalcor for full payment of Nalcor's obligations to Westinghouse. On June 1, 1993, when it became clear that Nalcor could not pay in full, Westinghouse demanded that Nalcor turn over its assets.

Nalcor complied with Westinghouse's demand and, in early June 1993, turned over its assets in place to Westinghouse, including the assets at the Sikeston Property. Westinghouse took possession of the Sikeston Property and began operating Nalcor's business while simultaneously marketing Nalcor's assets for sale. However, Westinghouse never foreclosed on Nalcor's leasehold. Furthermore, ARE Sikeston never requested Westinghouse's permission to exercise any rights against Nalcor's assets nor did ARE Sikeston ever request a termination or modification of the lease.

In the first week of June 1993, Westinghouse informed ARE Sikeston that Westinghouse had taken possession of Nalcor's assets at the Sikeston Property and that Westinghouse intended to run the business while it looked for a purchaser that would buy Nalcor as a going concern. According to Dale Kuhlman, ARE Sikeston's property manager, Westinghouse also discussed with ARE Sikeston that "it was in everyone's interest to allow

[Westinghouse] to continue to pay the rent, to market the property, because at the end we would each get what we wanted[;] . . . [Westinghouse] would get some payment for their assets and [ARE Sikeston] would get a tenant." Dale D. Kuhlman Dep. at 100, reprinted in III J.A. at 1257.  In a subsequent letter dated June 15, 1993, from Westinghouse's counsel, Westinghouse informed ARE Sikeston that "Westinghouse has made, and likely will in the future make, certain rent payments necessary to avoid a default by [Nalcor] under the Lease."  Letter of James P. Drummy (June 15, 1993) at 1, reprinted in III J.A. at 1424.  In that same letter, however,

Westinghouse stated that "in making such payments, Westinghouse is not assuming the Lease or any of tenants' obligations thereunder."  Id.

During the period that Westinghouse occupied the Sikeston Property, it paid the full rent as provided by the Nalcor lease.  In addition, when the insurance coverage previously maintained by Nalcor expired in July 1993, Westinghouse obtained new coverage effective July 24, 1993.

On June 17, 1993, Westinghouse gave notice to Nalcor that it would sell all or part of the secured assets of Nalcor at one or more private foreclosure sales on or after June 28, 1993.  In July 1993, Westinghouse began negotiating with Weslock National for the sale of Nalcor's lock manufacturing operations.  These negotiations culminated in a private foreclosure sale of Nalcor's lock manufacturing operations to Weslock National on August 4, 1993.  Weslock National, however, did not purchase Nalcor's plumbing parts manufacturing operations.

A letter agreement and two bills of sale memorialized the August 4, 1993 transaction.  In addition to excluding certain assets of Nalcor, such as any of Nalcor's remaining cash, both bills of sale specifically excluded from the sale "any of [Nalcor]'s rights as tenant in or with respect to leases or subleases of real property . . . ."  Bill of Sale & Assignment (Aug. 4, 1993) at 1, reprinted in Appellee's Add.  In addition, the parties also agreed in both bills of sale that:

> [Westinghouse] acknowledges that [Weslock National], in purchasing the Personal Property, is not assuming any indebtedness, liabilities or obligations of [Nalcor], [Westinghouse] or any other person or entity . . . .

Id. at 2.

Finally, the August 4, 1993 letter agreement between Westinghouse and Weslock National contained an integration clause that provided that:

> This Agreement and the Bills of Sale constitute the entire agreement between [Weslock National] and [Westinghouse] with regard to the Assets and any other matter. No other agreements or understandings exist between [Weslock National] and [Westinghouse] and, to the extent such other agreements or understandings may have existed prior to the execution of this Agreement, such understandings and agreements do not survive the execution hereof.

Letter Agreement (Aug. 4, 1993), reprinted in Appellee's Add.

Weslock National took control of the Sikeston Property on or about August 5, 1993. Weslock National retained some of the employees from Nalcor's Sikeston Property operations and some of Nalcor's mid-level managers in order to continue the plant's lock manufacturing operations. Nalcor itself was eventually dissolved sometime in 1994.

It was not until August 24, 1993, that ARE Sikeston learned that Weslock National was occupying the Sikeston Property. In an August 26, 1993 letter to Weslock National, ARE Sikeston wrote that, "[i]nsofar as Nalcor, Inc. is obligated under a lease on [the Sikeston Property], and we [ARE Sikeston] have not been asked nor consented to an assignment of this lease, it is uncertain on what basis [Weslock National] occup[ies] the property." Letter of John F. Horrigan, III (Aug. 26,

-15-

1993) at 1, <u>reprinted in</u> I J.A. at 340.  ARE Sikeston also advised Weslock National that "as occupant[, Weslock National is] under various obligations with respect to this property, including those to pay rent, properly maintain the facility and grounds, maintain operating permits, pay utilities, and insure the property among others."  <u>Id.</u>

Weslock National responded in a letter that it had purchased the lock manufacturing assets of Nalcor, but that "Weslock did not assume any of the obligations of [Nalcor], including any lease agreements for real property in Sikeston, Missouri." Letter of Donald B. Horan (Jan. 3, 1994) at 1, reprinted in I J.A. at 343. In addition, after noting that it had undertaken the ordinary obligations of a tenant, Weslock National requested ARE Sikeston to prepare a new lease because "both parties would be better served if the property was [sic] occupied under a lease." Id.

In response to Weslock National's letter, ARE Sikeston changed its position. ARE Sikeston abandoned its initial contention that "it [was] uncertain on what basis [Weslock National] occup[ied] the property" as well as its contention that Weslock National was obligated "as occupant." Letter of Horrigan at 1, reprinted in I J.A. at 340. Instead, on January 13, 1994, ARE Sikeston informed Weslock National that ARE Sikeston "believe[d] Weslock National is obligated under the terms of the [Nalcor] lease . . . ." Letter of John F. Horrigan, III (Jan. 13, 1994) at 1, reprinted in I J.A. at 345. For its part, however, Weslock National maintained that it "occup[ied] the facility on a month to month basis . . . ." Letter of Joe Bockrath (Sept. 6, 1994) at 1, reprinted in I J.A. at 351. Discussions between the parties were held, but no agreement was reached.

On September 6, 1994, Weslock National gave written notice to ARE Sikeston that Weslock National had decided to leave the Sikeston Property and relocate operations to another facility. On December 31, 1994, Weslock National

vacated the premises.  During the entire period that it was in possession of the Sikeston Property, Weslock National paid rent to ARE Sikeston for the use of the Sikeston Property.  For the nearly five-month period between August 5, 1993, and December 31, 1993, Weslock National paid the full amount of the rent called for in the Nalcor lease.  During 1994, however, Weslock National continued to pay at the 1993 rate rather than pay rent at the increased rate called for by the inflation-adjustment provision contained in the

Nalcor lease. Weslock National also paid the insurance premiums, property taxes, real estate taxes, utilities, upkeep and maintenance costs, and operating fees for the plant.

On November 30, 1994, ARE Sikeston filed a breach of contract claim against Weslock National in Missouri state court. In its complaint, ARE Sikeston claimed that Weslock National was obligated under the terms of the Nalcor lease and that Weslock National had failed to satisfy the terms of that lease. On December 21, 1994, Weslock National removed the case to the district court pursuant to 28 U.S.C. § 1441 (1994). Federal subject matter jurisdiction was established because ARE Sikeston is a Pennsylvania partnership with business offices in Pennsylvania, and Weslock National is an Oklahoma corporation with facilities in Missouri and California. Both parties agree that Missouri substantive law governs this dispute.

The district court initially set trial for December 4, 1995. On September 20, 1995, ARE Sikeston sought leave to amend its complaint to add Nalcor as a defendant and assert four new claims against Weslock National. On October 19, 1995, the district court granted ARE Sikeston's request, and on October 30, 1995, ARE Sikeston filed its first amended complaint. In that complaint, ARE Sikeston added Nalcor as a defendant and brought claims against Weslock National for breach of contract, breach of estate covenants, malicious interference with contract, fraud, fraudulent conveyance, and unjust

enrichment.[4]  ARE Sikeston sought as damages all rents, taxes, utilities, and maintenance costs for the Sikeston Property through the expiration of the Nalcor lease in December 2003.  In the alternative, ARE Sikeston sought $2.5 million in damages under a buy-back provision of the lease.

On November 6, 1995, Weslock National filed its answer to ARE Sikeston's first amended complaint and filed a third-party complaint, pursuant to Federal Rule of Civil Procedure 14, against Westinghouse, which is a Pennsylvania corporation with

---

[4]ARE Sikeston has not raised its unjust enrichment claim on appeal.

its principal place of business in Pennsylvania. In its third-party complaint, Weslock National sought indemnity or contribution in the event that Weslock National was held liable to ARE Sikeston. The district court postponed the trial and rescheduled it for March 25, 1996.

On March 11, 1996, Weslock National moved for summary judgment. A few days later, on March 14, 1996, the district court moved the trial date to July 1, 1996. On April 11, 1996, ARE Sikeston moved for leave to file a second amended complaint to assert state law real property and breach of contract claims directly against Westinghouse or, in the alternative, for a remand to Missouri state court. ARE Sikeston pleaded 28 U.S.C. § 1367 (1994) as the basis for the district court's jurisdiction over these claims. On May 8, 1996, Westinghouse filed its own motion for summary judgment on Weslock National's indemnification claim. On June 21, 1996, the district court denied ARE Sikeston's motion to file a second amended complaint and granted summary judgment to Weslock National. ARE Sikeston, 932 F. Supp. at 243. Because the district court granted summary judgment to Weslock National, it also granted summary judgment to Westinghouse: the liability of Westinghouse on Weslock National's indemnification claim was entirely dependent on Weslock National's liability to ARE Sikeston. Id. On July 9, 1996, the district court entered default judgment against Nalcor in the amount of $2,450,000.[5]

---

[5]After Westinghouse foreclosed on nearly all of Nalcor's assets, Nalcor was dissolved in 1994. We recognize, therefore, that it is highly unlikely that ARE Sikeston

On July 17, 1996, ARE Sikeston filed a motion to alter or amend the judgment by reconsideration of summary judgment pursuant to Federal Rule of Civil Procedure 59. The motion was denied. ARE Sikeston now appeals to this Court, and Weslock National brings a protective cross appeal.

will ever be able to collect on this judgment.

## II.

On appeal, we review de novo the district court's grant of summary judgment to Weslock National and Westinghouse. See McCormack v. Citibank, N.A., 100 F.3d 532, 537 (8th Cir. 1996). Summary judgment is proper only if the record, viewed in the light most favorable to the nonmoving party, presents no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Id.; see also Fed. R. Civ. P. 56(c). Furthermore, if there has been adequate time for discovery, Federal Rule of Civil Procedure 56(c) mandates that the district court grant a motion for summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Finally, we may affirm the district court's grant of summary judgment to Weslock National and Westinghouse "on any grounds supported by the record." Ricke v. Armco Inc., 92 F.3d 720, 721 (8th Cir. 1996) (quotations and citation omitted).

ARE Sikeston argues that the district court erred in granting summary judgment on ARE Sikeston's breach of contract claim. According to ARE Sikeston, Weslock National assumed the obligations of the Nalcor lease on August 4, 1993, through the purchase of substantially all the assets of Nalcor. Thus, ARE Sikeston argues that, because Weslock National assumed the Nalcor lease, Weslock National is now liable for the remaining years of that lease. We disagree.

-23-

In general, "courts in Missouri have not seen fit to depart from the traditional distinction between corporate mergers or the sale and purchase of outstanding stock of a corporation, whereby preexisting corporate liabilities also pass to the surviving corporation or to the purchaser, and the sale and purchase of corporate assets which eliminates successor liability." Chemical Design, Inc. v. American Standard, Inc., 847 S.W.2d 488, 492-93 (Mo. Ct. App. 1993); see also Ernst v. Ford Motor Co., 813 S.W.2d 910, 916-17 (Mo. Ct. App. 1991). Accordingly, "[t]he general rule in Missouri

is that when all of the assets of a corporation are sold or transferred the transferee is not liable for the transferor's debts and liabilities." Chemical Design, 847 S.W.2d at 491.

There are, however, four exceptions to the general rule of nonliability. The purchasing corporation can be liable for the selling corporation's debts and liabilities: (1) where the purchaser expressly or impliedly agrees to assume the debts or liabilities of the transferor; (2) where the transaction amounts to a merger or consolidation; (3) where the purchasing corporation is merely a continuation of the selling corporation; or (4) where the transaction is entered into fraudulently for the purpose of escaping liability for the debts and liabilities of the transferor. Id.; Ernst, 813 S.W.2d at 917.

In the present action, it is undisputed that Weslock National purchased Nalcor's assets, not its stock, from Westinghouse. In form at least, Weslock National therefore did not merge or consolidate with either Nalcor or Westinghouse. Thus, unless ARE Sikeston can prove that Weslock National's purchase of Nalcor's assets fits within one of the four exceptions to the general rule of nonliability, we must hold that Weslock National did not assume the liabilities of the Nalcor lease. We address each exception in turn.

First, Weslock National did not expressly or impliedly agree to assume the debts or liabilities of either Westinghouse or Nalcor. Instead, Weslock National and Westinghouse clearly expressed in writing their intention that (1) no rights under the lease were being assigned to Weslock National and (2) Weslock National was

not promising to perform any of the obligations under the Nalcor lease. The two bills of sale specifically excluded from the sale "any of [Nalcor]'s rights as tenant in or with respect to leases or subleases of real property . . . ." Bill of Sale & Assignment (Aug. 4, 1993) at 1, <u>reprinted in</u> Appellee's Add. The parties also agreed that "[Weslock National], in purchasing the Personal Property [of Nalcor], is not assuming any indebtedness, liabilities or obligations of [Nalcor], [Westinghouse] or any other person or entity . . . ." <u>Id.</u> at 2, <u>reprinted in</u> Appellee's Add. Finally, the August 4, 1993 letter

agreement between Westinghouse and Weslock National contained an integration clause.

The written agreements thus make clear that Weslock National did not accept the obligations under the Nalcor lease. Accordingly, in light of these express provisions that directly contradict any notion that Weslock National expressly or impliedly agreed to assume the Nalcor lease, we conclude that Weslock National did not expressly or impliedly agree to assume the Nalcor lease. See Carondelet Health Sys., Inc. v. Royal Garden Assocs., 943 S.W.2d 669, 673 (Mo. Ct. App. 1997) ("The cardinal rule in the interpretation of a contract is to ascertain the intention of the parties and to give effect to that intention. Where the contract is unambiguous, intent is ascertained from the contract alone." (quotations and citation omitted)).

Second, the August 4, 1993 transaction did not amount to a merger or consolidation, but was instead a transaction in which Weslock National purchased the assets of Nalcor's lock manufacturing operations from Westinghouse. Under Missouri law, the elements of a de facto merger include: "(1) a continuation of management and personnel and general business operations; (2) a continuity of shareholders resulting from the purchasing corporation paying for the assets with shares of its own stock so the selling corporation stockholders become a constituent part of the purchasing corporation; (3) the seller corporation ceasing ordinary business operations and dissolving as soon as possible; and (4) the purchasing corporation assuming those obligations necessary to continue normal, ordinary business

-27-

operations." <u>Harashe v. Flintkote Co.</u>, 848 S.W.2d 506, 509 (Mo. Ct. App. 1993).

Although Weslock National continued Nalcor's lock manufacturing operations, Weslock National did not continue any of Nalcor's other operations, such as its plumbing manufacturing operations. In addition, although Weslock National retained some of Nalcor's employees and a few mid-level managers, the record indicates that Weslock National, as a separate corporation, was run by a different set of directors and

officers.  Moreover, Weslock National paid for Nalcor's assets with cash, and as a result, there was no continuity of shareholders.  Finally, there is some evidence that Nalcor did not cease its ordinary business operations immediately following the August 4, 1993 transaction, but instead may have continued its plumbing parts manufacturing operations for a time after Weslock National's purchase of Nalcor's assets.  Nalcor was not dissolved until sometime in 1994.  For these reasons, we conclude that the August 4, 1993 transaction was not a de facto merger or consolidation.

Turning to the third exception, Weslock National is not a mere continuation of Nalcor.  Although there is evidence that Weslock National retained some of the former employees of Nalcor, the evidence in the record does not demonstrate that the corporate organization, the management, and the operations of the entity that was formerly Nalcor remained unchanged.  Instead, the evidence indicates that Weslock National, a separate entity with its own organization, directors, and shareholders, took over only the lock manufacturing operations of Nalcor.  Accordingly, we hold that the August 4, 1993 transaction does not fit within the third exception to the general rule that a purchaser of assets is not liable for the seller's liabilities. See Chemical Design, 847 S.W.2d at 493 ("Missouri continues to adhere to the concept that the phrase 'continuation of the corporation' should be literally applied to the continuation of the corporate organization, management, and operations, rather than merely the continuation of the enterprise or the product line." (emphasis added)); cf. Brockmann v. O'Neill, 565 S.W.2d 796, 798 (Mo. Ct. App. 1978) (finding mere continuation where (1) both

transferor and transferee were in same business; (2) the directors, primary officers, and major shareholders of the transferor when it ceased to do business were two of the incorporators, directors, primary officers, and major shareholders of the transferee; and (3) the business operations of both transferor and transferee were exactly the same); see also Flotte v. United Claims, Inc., 657 S.W.2d 387, 389 (Mo. Ct. App. 1983) (noting the Brockmann court's "emphasis was on the common identity of officers, directors and stockholders between the purchasing and selling corporations as the key element of a 'continuation'").

Finally, Westinghouse and Weslock National did not, as ARE Sikeston argues, commit fraud when they entered into the August 4, 1993 transaction. To bring a cause of action for fraud, a plaintiff must prove: (1) a representation; (2) the falsity of that representation; (3) the materiality of that representation; (4) the speaker's knowledge of its falsity or the speaker's ignorance of the truth; (5) the speaker's intent that his representation be acted upon by the hearer in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximately caused injury. Slone v. Purina Mills, Inc., 927 S.W.2d 358, 371 (Mo. Ct. App. 1996); see also State ex. rel. Painewebber, Inc. v. Voorhees, 891 S.W.2d 126, 128 (Mo. 1995) (en banc).

Even if we assume that the first eight elements of an action for fraud have been met and that Weslock National can be held accountable for those elements, ARE Sikeston has not made a showing sufficient to establish that the allegedly fraudulent inducements of Weslock National and Westinghouse proximately caused injury to ARE Sikeston. Under Missouri law, in order for a false representation to be actionable, "[i]t must appear in an appreciable sense that the damage flowed from the fraud as the proximate and not the remote cause, and the damage must be such as is the natural and probable consequence of the fraud." Herberer v. Shell Oil Co., 744 S.W.2d 441, 443-44 (Mo. 1988) (en banc) (quotations and citation omitted); see also Thoroughbred Ford, Inc. v. Ford Motor Co., 908 S.W.2d 719, 735 (Mo. Ct. App. 1995). Moreover,

a plaintiff cannot recover for lost rental income if it is uncertain or speculative whether the loss was the result of the alleged wrong and whether any such rental income would have been derived at all. See Thoroughbred Ford, 908 S.W.2d at 735.

The proximate cause of ARE Sikeston's loss of rental income was the insolvency of Nalcor. Because of Nalcor's insolvency, Nalcor could not meet its obligations under the lease. Moreover, because ARE Sikeston had subordinated its security interests in

Nalcor's assets to Westinghouse's security interest, ARE Sikeston was unable to collect by seizing Nalcor's assets.

Nonetheless, ARE Sikeston argues that Westinghouse and Weslock National caused injury by falsely representing that the purchaser of Nalcor's assets would assume the Nalcor lease and by concealing the sale of Nalcor's assets to avoid the liabilities under that lease. According to ARE Sikeston, as a result of Westinghouse's and Weslock National's fraudulent representations, ARE Sikeston did not exercise its rights under the lease and thereby lost the opportunity to bind Weslock National or some other party to the Nalcor lease. ARE Sikeston thus argues that it is entitled to the benefit of the bargain that Westinghouse and Weslock National allegedly promised--a new tenant willing to assume the Nalcor lease.

Given that ARE Sikeston had expressly subordinated its security interest in Nalcor's assets to Westinghouse and that Westinghouse was undersecured, the sole recourse remaining to ARE Sikeston was its right to terminate the lease and take possession of the Sikeston Property.[6] Therefore, ARE Sikeston essentially argues that, because it was fraudulently induced into not terminating the lease, it lost an opportunity to bind Westinghouse, Weslock National, or some other party to the terms of the Nalcor lease and that, as a direct result of this missed

_____

[6]We note that even this right was subject to Westinghouse's approval, which was never sought. See Landlord's Consent & Waiver of Lien Rights (Dec. 29, 1989) at § 3, reprinted in Appellee's Add.

opportunity, ARE Sikeston suffered a loss of rental income.

It is at best highly speculative whether ARE Sikeston could have bound another party to the terms of the Nalcor lease by exercising its termination right.  There is no indication that either Westinghouse or Weslock National would have assumed the

Nalcor lease. Instead, the record demonstrates that both Westinghouse and Weslock National were adamantly opposed to assuming the Nalcor lease.

In addition, ARE Sikeston has offered no evidence that, had the lease been terminated sooner, a third party would have been willing to assume the lease. Indeed, the unwillingness of either Westinghouse or Weslock National to assume the Nalcor lease combined with the intense desire of ARE Sikeston to have a party assume that lease supports the inference that ARE Sikeston was earning an above market rate of return on the Sikeston Property under the Nalcor lease. As a result, under then current market conditions, it is unlikely that ARE Sikeston could have found a tenant willing to assume the Nalcor lease.

Furthermore, assuming arguendo that ARE Sikeston's termination of the Nalcor lease would have allowed it to bind another party to that lease, ARE Sikeston has offered no explanation for why it did not terminate the lease in January 1994, once it realized that Weslock National was unwilling to assume the obligations of that lease. There is no evidence in the record that ARE Sikeston's opportunity to exercise its right of termination and thereby find another party to assume the Nalcor lease lasted only from June 1993, when Westinghouse foreclosed on Nalcor's assets, to January 1994.

We also note that, during the time that Westinghouse and then Weslock National occupied the Sikeston Property, each occupant paid rent as well as the cost of insurance.

Weslock National even paid for maintenance and upkeep of the premises during its occupancy.  ARE Sikeston consequently received nineteen months of rental income that it might not otherwise have received.  For these reasons, we hold that ARE Sikeston was not injured by the alleged fraud of either Weslock National or Westinghouse. Cf. Herberer, 744 S.W.2d at 444 (holding that, where a gas station manager agreed to an extension of the lease on his existing gas station in exchange for the oil company's promise that the manager could run a new station, the manager could not bring an action for fraud after the oil company reneged on its promise because the

lost profits at the new station were not the "natural and probable consequence" of the manager's reliance on the oil company's promise to grant him the right to operate the new station); <u>Thoroughbred Ford</u>, 908 S.W.2d at 736 (holding that plaintiffs failed to prove with reasonable certainty that misrepresentation caused lost profits at least in part because defendant produced evidence that indicated profits were unlikely due to poor market conditions).

Thus, because we conclude as a matter of law that none of the exceptions to the general rule of nonliability apply, we must follow Missouri's general rule for asset purchases. We therefore hold that Weslock National is not liable for Nalcor's contractual obligations. Accordingly, we hold that the district court did not err in granting summary judgment to Weslock National on ARE Sikeston's breach of contract claim.

### III.

ARE Sikeston argues that the district court erred in granting summary judgment on ARE Sikeston's claim for breach of covenants arising through privity of estate. According to ARE Sikeston, Weslock National and ARE Sikeston are in privity of estate and that, by virtue of this privity of estate, Weslock National is liable for performance of covenants running with the leasehold that are contained in the Nalcor lease. We disagree.

For ARE Sikeston and Weslock National to have been in privity of estate such that Weslock National was obligated to perform the obligations contained in the

Nalcor lease, Weslock National needed to acquire Nalcor's leasehold by assignment. <u>Cf.</u> <u>Siragusa v. Park</u>, 913 S.W.2d 915, 918 (Mo. Ct. App. 1996) ("<u>Upon an assignment by the lessee</u>, the privity of estate between the lessee and lessor is destroyed, and a new privity of estate is created between the assignee and the lessor." (emphasis added)); <u>Newfeld v. Chemical Dynamics, Inc.</u>, 784 S.W.2d 240, 242 (Mo. Ct. App. 1989)

("When Chemical <u>assigned</u> the leasehold, the privity of estate between Chemical and the original owners was destroyed and a new privity of estate was created between the owners and, the assignee, Lawrence Newfeld." (emphasis added)); <u>Hudson v. Price</u>, 273 S.W.2d 518, 522 (Mo. Ct. App. 1954) ("When the lease was originally executed a privity of contract and a privity of estate existed between lessor (plaintiff) and lessee.  When the lessee <u>assigned</u> the lease to defendant, the privity of contract continued between lessor (plaintiff) and lessee, and the privity of estate existed between lessor (plaintiff) and assignee (defendant) for the <u>unexpired term of the lease</u>." (first emphasis added; second emphasis in original)); <u>Mutual Drug Co. v. Sewall</u>, 182 S.W.2d 575, 578 (Mo. 1944) ("The assignment . . . from Quapaw to plaintiff did not specifically provide for payment of rent to Fitch, but <u>the assignment created</u> between the original lessor Fitch and plaintiff privity of estate . . . ." (emphasis added)).

As discussed above, Weslock National did not assume the obligations of the Nalcor lease, but instead expressly rejected those obligations.  Therefore, Weslock National was never assigned the lease.  <u>Cf.</u> <u>South Lakeview Plaza v. Citizens Nat'l Bank of Greater St. Louis</u>, 703 S.W.2d 84, 86 (Mo. Ct. App. 1985) ("[W]here an assignment <u>is in fact accepted by the assignee to whom it is given</u>, the assignment is absolutely effective . . . ." (emphasis added)); <u>Hahn v. Earth City Corp.</u>, 625 S.W.2d 640, 643 (Mo. Ct. App. 1981) ("If the assignor expressly delegates his duties <u>and the assignee expressly promises to perform those duties</u>, the assignee becomes liable to the original contracting party on a creditor beneficiary

theory." (emphasis added)).  As a result, there was no privity of estate and hence Weslock National was never obligated to perform covenants running with the Nalcor leasehold.  Accordingly, summary judgment on ARE Sikeston's breach of covenant claim was proper.

## IV.

ARE Sikeston argues that the district court erred in granting summary judgment on ARE Sikeston's fraud[7] and tortious interference with contract claims. We disagree.

To bring a claim for fraud, ARE Sikeston must prove that the alleged fraud proximately caused injury. <u>Slone</u>, 927 S.W.2d at 371. Similarly, to bring a claim for tortious interference with a contract or business expectancy, ARE Sikeston must prove that the alleged interference caused damages. See <u>id.</u> at 369-70; <u>see also</u> <u>Nazeri v. Missouri Valley College</u>, 860 S.W.2d 303, 316 (Mo. 1993) (en banc). In both its fraud claim and its tortious interference with contract claim, ARE Sikeston alleges essentially the same facts. ARE Sikeston alleges that, by concealing the August 4, 1993 transaction, Weslock National prevented ARE Sikeston from exercising its right to terminate the Nalcor lease and thereby prevented ARE Sikeston from obtaining the benefits of that lease.

As we have already discussed, ARE Sikeston has not made a showing sufficient to establish the existence of evidence that Weslock National's conduct caused injury or damages--an element essential to its cause of action for both fraud and intentional interference with contract. Accordingly, summary judgment on ARE Sikeston's fraud and intentional interference claims is proper. See <u>Celotex</u>

---

[7]In addition to arguing that the August 4, 1993 transaction fits within the fraud exception to the general rule of nonliability for a purchaser of corporate assets, ARE Sikeston also brings a separate claim for fraud.

<u>Corp.</u>, 477 U.S. at 322.

## V.

ARE Sikeston argues that the district court erred in granting summary judgment because the August 4, 1993 foreclosure sale of Nalcor's assets to Weslock National

constituted a fraudulent conveyance of real property rights. We reject this argument for the same reasons that we reject ARE Sikeston's claims of fraud in the August 4, 1993 transaction.

## VI.

ARE Sikeston argues that it should have been granted leave to amend its complaint to state claims against Westinghouse or, in the alternative, that the district court should have remanded the case to Missouri state court where ARE Sikeston originally brought this action. We disagree.

We review the district court's decision to deny ARE Sikeston's motion for leave to amend its complaint for abuse of discretion. Wald v. Southwestern Bell Corp. Customcare Med. Plan, 83 F.3d 1002, 1005 (8th Cir. 1996). Although leave to amend should be freely granted to insure that a case is decided on its merits, "permission need not be granted after undue delay or where amendment would be futile." Ferguson v. Cape Girardeau County, 88 F.3d 647, 650-51 (8th Cir. 1996).

The district court denied leave to amend because it concluded that "[a]t this late stage in the proceedings it is inappropriate for the Court to allow the plaintiff to amend." ARE Sikeston, 932 F. Supp. at 241. The district court explained that "[t]here is no new factual basis put forth nor any reason for the Plaintiff's delay." Id. In addition, the district court noted that "the inclusion of [ARE Sikeston's] new suggested party[, Westinghouse,] would violate diversity and require

-43-

remand." Id.

We conclude that the district court properly denied ARE Sikeston's motion for leave to amend and denied ARE Sikeston's motion in the alternative for remand. With respect to the delay, ARE Sikeston did not seek to assert any claims against Westinghouse until more than sixteen months after it filed suit for the alleged breach of the Nalcor lease. In addition, it took ARE Sikeston more than five months to move

for leave to assert claims against Westinghouse even after Weslock National brought its third-party complaint against Westinghouse.

The only explanation that ARE Sikeston offers for this delay is that, because it originally did not know of the August 4, 1993 transaction between Weslock National and Westinghouse, ARE Sikeston did not know of Westinghouse's role in the alleged breach of the Nalcor lease. However, as early as June 1993, nearly three years before ARE Sikeston sought to bring its amended complaint against Westinghouse, ARE Sikeston knew that Westinghouse had taken possession of Nalcor's assets at the Sikeston Property and that Westinghouse planned to sell those assets. ARE Sikeston also knew, at roughly the same time, that Westinghouse had indicated that the purchaser of Nalcor's assets would be ARE Sikeston's new tenant at the Sikeston Property. Insofar as these actions provide the only basis for the claims that ARE Sikeston now seeks to bring against Westinghouse, we find ARE Sikeston's explanation for its delay lacking.

Furthermore, we also note that the district court did not have subject matter jurisdiction over ARE Sikeston's claims against Westinghouse. Because the claims that ARE Sikeston sought to bring against Westinghouse involve only state law claims, diversity of citizenship would have been the only basis for the original jurisdiction of the district court. However, joining Westinghouse as a defendant would eviscerate the district court's original jurisdiction because both ARE Sikeston and Westinghouse are citizens of Pennsylvania. See Caterpillar Inc. v. Lewis, 117 S. Ct. 467, 472 (1996) (construing 28 U.S.C.

-45-

§ 1332(a) to find a requirement of complete diversity between opposing parties).

In addition, the district court did not have supplemental jurisdiction over ARE Sikeston's claims against Westinghouse. Under 28 U.S.C. § 1367(b), "[i]n any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title [diversity jurisdiction], the district courts shall not have supplemental

jurisdiction under [§ 1367(a)] over claims by plaintiffs against persons made parties under Rule 14 . . . ." 28 U.S.C. § 1367(b) (1994). In the instant action, although the district court's removal jurisdiction was based on 28 U.S.C. § 1441, its original jurisdiction was founded solely on § 1332, and Westinghouse, as a third-party defendant, was made a party pursuant to Rule 14. See Fed. R. Civ. P. 14(a) (governing when a defendant, as a third-party plaintiff, can bring an additional party into an action as a third-party defendant). Thus, § 1367(b) bars the district court from exercising supplemental jurisdiction over ARE Sikeston's claims against Westinghouse.

Without either original jurisdiction or supplemental jurisdiction over ARE Sikeston's claims against Westinghouse, the district court did not have subject matter jurisdiction over those claims. Moreover, Westinghouse was not a party indispensable to the adjudication of ARE Sikeston's claims against Weslock National. As a result, the district court could, in its discretion, choose either to deny ARE Sikeston's motion for leave to amend or to grant the motion and remand the case to state court. See 28 U.S.C. § 1447(e) (1994) ("If after removal the plaintiff seeks to join additional defendants whose joinder would destroy subject matter jurisdiction, the court may deny joinder, or permit joinder and remand the action to the State court." (emphasis added)). Given the lack of subject matter jurisdiction and the undue delay caused by ARE Sikeston, we hold that the district court did not abuse its discretion in denying ARE Sikeston's motion for leave to amend or in denying ARE Sikeston's request for a remand.

-47-

## VII.

For the foregoing reasons, we affirm.[8]

---

[8]We also conclude that Weslock National's cross-appeal is moot. In its cross-appeal, Weslock National argued that, because the district court's grant of summary judgment to Westinghouse was premised entirely on the district court's conclusion that Weslock National was entitled to summary judgment, this Court should reverse the district court's grant of summary judgment to Westinghouse if we found that the district court had improperly granted summary judgment to Weslock National. Because we hold that the district court properly granted summary judgment to Weslock National, we agree with the district court that Westinghouse is entitled to summary judgment on Weslock National's indemnification and contribution claims. In addition, because we hold that the district court's grants of summary judgment to Weslock National and Westinghouse were proper, ARE Sikeston's argument that the district court erred in denying ARE Sikeston's motion to reconsider is also moot.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.